900/14-6733.DA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROGER ROTTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ELK GROVE VILLAGE, an Illinois Municipal | ) | |
| Entity; OFFICER JOHN WILLIAMS; and | ) | |
| OFFICER RUSSELL SULLIVAN, | ) | |
| | ) | |
| _____ | ) | NO. 1:14-cv-7583 |
| | ) | |
| ELK GROVE VILLAGE, an Illinois Municipal | ) | |
| Entity, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| v. | ) | |
| | ) | |
| ROGER ROTTER, | ) | |
| | ) | Magistrate Judge Michael T. Mason |
| Plaintiff/Counter-Defendant. | ) | |

**RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT
OF ADDITIONAL FACTS REQUIRING DENIAL BY
ELK GROVE VILLAGE AND OFFICERS WILLIAMS AND SULLIVAN**

NOW COME the Defendant/Counter-Plaintiff, ELK GROVE VILLAGE, an Illinois municipal entity, and Defendants, OFFICER JOHN WILLIAMS and OFFICER RUSSELL SULLIVAN, by and through one of their attorneys, Amanda M. Zdarsky, and, for their response to the Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts, state as follows:

1. Plaintiff ROGER ROTTER is hearing impaired, and has been all his life. (Deposition of ROGER ROTTER (hereinafter "Pltf Dep"), pp. 4, 51-52.) When his hearing aids are out, he can only hear sounds, but he cannot make them out. (Pltf Dep, pp. 100-101.) The only way he can carry on a conversation is by reading lips. (Pltf Dep, pp. 100-101.)

**RESPONSE:**        Admit that Rotter is hearing impaired, and has been all his life and admit that, with his hearing aids out in a normal conversational tone, Rotter may only hear sounds can carry on a conversation only by reading lips. However, deny the remaining as even with his hearing aids out, Rotter could still hear someone yelling with a raised voice. (Pl. Dep. at 100).

                           Immaterial to Defendants' Motion for Summary Judgment.

2.      When OFFICER WILLIAMS ("OFC. WILLIAMS") responded to the location in the center of the parking lot where OFFICER SULLIVAN ("OFC. SULLIVAN") was with ROTTER, he observed OFC. SULLIVAN bent over holding ROTTER against a white vehicle. (Deposition of OFC. WILLIAMS (hereinafter "WILLIAMS Dep.), pp. 133-134.)

**RESPONSE:**        Admit. Immaterial to Defendants' Motion for Summary Judgment.

3.      It appeared to OFC. WILLIAMS that ROTTER had a clenched fist and was attempting to strike OFC. SULLIVAN'S side. (WILLIAMS Dep, p. 139.)

**RESPONSE:**        Admit. Immaterial to Defendants' Motion for Summary Judgment.

4.      OFC. WILLIAMS grabbed one of ROTTER'S arms and attempted to take him into custody, but was unable. (WILLIAMS Dep, p. 140.)

**RESPONSE:**        Admit. Immaterial to Defendants' Motion for Summary Judgment

5.      OFC. SULLIVAN then stated he was going to use his taser, and deployed it on ROTTER, using it in projectile mode. (WILLIAMS Dep, pp. 140-141.)

**RESPONSE:**        Admit. Immaterial to Defendants' Motion for Summary Judgment.

6.      ROTTER'S knees buckled, and he fell to the ground, landing initially on his side. (WILLIAMS Dep, pp. 141, 144-145.)

**RESPONSE:**        Admit. Immaterial to Defendants' Motion for Summary Judgment.

7.      By this point, ROTTER'S hearing aids had been knocked out. (Pltf Dep, p. 98.)

**RESPONSE:**        Admit. Immaterial to Defendants' Motion for Summary Judgment.

8.     Once down, ROTTER was lying on the ground still, at which time OFC. WILLIAMS was able to cuff his left arm. ROTTER'S right arm and right hand was underneath his body while he was lying face down. (WILLIAMS Dep, pp. 145-146.)

**RESPONSE:**     Deny. Rotter's legs were moving and arm flailing back and forth. The officers were not able to get Rotter's arm under control. (Williams Dep. at 149). Rotter was rolling around side-to-side, trying to break free from the officers. (Sullivan Dep. at 105).

Immaterial to Defendants' Motion for Summary Judgment.

9.     While ROTTER remained lying on the ground, OFC. SULLIVAN delivered another taser cycle to ROTTER'S back. (WILLIAMS Dep, pp. 149-150).

**RESPONSE:**     Deny. See paragraph 8.

Immaterial to Defendants' Motion for Summary Judgment.

10.    Each "cycle" refers to a five second period that the taser continues to send an electrical impulse after its trigger has been pulled. (WILLIAMS Dep, p. 150.) Getting tased is painful. A person getting tased cannot move. (Deposition of OFC. Kristina Jedlink, pp. 15-16.)

**RESPONSE:**     Admit. Immaterial to Defendants' Motion for Summary Judgment.

11.    In his report, OFC. WILLIAMS indicated that after the second application of the taser by OFC. SULLIVAN, Officer Dredge arrived and was able to place a handcuff on ROTTER'S right arm, at which time OFC. WILLIAMS connected that cuff to the one on ROTTER'S left arm. (WILLIAMS Dep, p. 150-151.)

**RESPONSE:**     Admit. Immaterial to Defendants' Motion for Summary Judgment.

12.    Though he only noted two instances of OFC. SULLIVAN'S taser use in his report, OFC. WILLIAMS testified he thought there was more than two times, but he doesn't know how many. (WILLIAMS Dep, p. 151.)

**RESPONSE:**     Admit. Immaterial to Defendants' Motion for Summary Judgment.

13.    Tasers have an internal mechanism that records and stores data regarding the taser's use. Among that data, which can be downloaded, is data regarding the number of times a taser is deployed on a particular day, data regarding the time at which a deployment was made, and data regarding the duration of any deployment. (Deposition of OFC. SULLIVAN ("SULLIVAN Dep", p. 146.)

3

**RESPONSE:**       Admit. Immaterial to Defendants' Motion for Summary Judgment.


14.       The download of the data stored within the X26 taser used by OFC. SULLIVAN that day shows eleven five-second deployments of that taser within less than two minutes. (SULLIVAN Dep, pp. 145-147; SULLIVAN Deposition Exhibit 14, documents bates labeled D04072 and 04073.)

**RESPONSE:**       Admit. Immaterial to Defendants' Motion for Summary Judgment.


15.       During the time ROTTER was on the ground with OFFICERS WILLIAMS and SULLIVAN engaged in trying to control him, ROTTER was either screaming or wailing or making some kind of high-pitched noise, all of which was recorded on the audio portion of OFC. SULLIVAN'S in-squad video/audio recording system. (WILLIAMS Dep, pp. 125-126,152-153; DVD Recording taken from OFC. SULLIVAN'S squad car.)

**RESPONSE:**       Admit. Immaterial to Defendants' Motion for Summary Judgment.


16.       In 2012, the ELK GROVE VILLAGE Police Department had in force and effect a written use of force policy embodied in a General Order that had initially been issued February 11, 2010. (Deposition of John Nowacki ("Nowacki Dep"), pp. 46-47; General Order 1.1 (bates labeled D04352-D04357). This written policy included provisions addressing the use of a "conducted energy weapon," also known as a Taser X26. (General Order 1.1 bates D04354-D04355.)

**RESPONSE:**       Admit.


17.       The written policy on Taser use includes the following statement: "Mere passive resistance does not permit the use of the Taser absent words or actions showing intent to actively resist or cause harm to self, the officer(s) or others." (General order 1.1, bates D04354)

**RESPONSE:**       Admit.


18.       The written policy on Taser use does not include any definition or explanation of the phrase "mere passive resistance." Similarly, it does not include any explanation, delimitation, or clarification of the phrase "words or actions showing intent to actively resist or cause harm.' (General Order 1.1, bates D04354-D04355.)

**RESPONSE:**       Admit.

19.     There are no other ELK GROVE VILLAGE policies or general orders that provide a definition of the phrase "mere passive resistance." (Nowacki Dep, pp. 48-49.)

**RESPONSE:**     Admit.


20.     John Nowacki has served as a deputy chief for the ELK GROVE VILLAGE police Department for five years. His duties and responsibilities have included oversight of the field service division, which basically includes all the officers in uniform. (Nowacki Dep, pp. 6-7.)

**RESPONSE:**     Admit. Immaterial to Defendants' Motion for Summary Judgment.


21.     Deputy Chief Nowacki has never undergone taser training, has never carried a taser on duty, and has never observed other officers being trained on the use of a taser. (Nowacki Dep, pp. 12-13.)

**RESPONSE:**     Admit. Immaterial to Defendants' Motion for Summary Judgment.


22.     Deputy Chief Nowacki has never served as a field training officer, nor has he ever held any other role within the department having to do with providing training to sworn officers. (Nowacki Dep, p. 15.)

**RESPONSE:**     Admit. Immaterial to Defendants' Motion for Summary Judgment.


23.     One of Deputy Chief Nowacki's specific functions has been reviewing internal use of force reports. According to ELK GROVE VILLAGE policy, such reviews were to be done on a yearly basis, as required by the Commission on Accreditation for Law Enforcement Agencies. (Nowacki Dep, pp. 7-9.)

**RESPONSE:**     Admit. Immaterial to Defendants' Motion for Summary Judgment.


24.     In order to prepare the annual year-end report regarding use-of-force incidents from the one-year period preceding that review, Deputy Chief Nowacki took all the use of force incident reports from that year, summarized them, basically breaking them down into smaller segments in order to identify any patterns that developed to see if anything needs to be addressed by the agency. The process also includes determining if the department needs either training or equipment, or needs to change any policies or procedures due to any of the identified patterns. (Nowacki Dep, p. 20.)

**RESPONSE:**     Admit. Immaterial to Defendants' Motion for Summary Judgment.

25.     In connection with the review of use-of-force incidents for 2012, and before meeting with the other two members of the staff review team, Deputy Chief Nowacki reviewed all of the use of force reports having to do with taser usages by officers during that year, including the report for the September 30, 2012 incident involving OFC. SULLIVAN'S taser deployment on ROTTER. (Nowacki Dep, pp. 20-22; Use of Force Reports, bates labeled D04192-D04197.)

**RESPONSE:**     Admit. Immaterial to Defendants' Motion for Summary Judgment.


26.     Deputy Chief Nowacki also reviewed the reports that would be associated with those internal use of force reports, such as general case reports, crime versus person reports, and any other narrative reports submitted by other officers who were present at the scene in connection with a particular instance where a taser was used. (Nowacki Dep, pp. 22-23.)

**RESPONSE:**     Admit. Immaterial to Defendants' Motion for Summary Judgment.


27.     As part of the use of force review process, Deputy Chief Nowacki did not speak with any of the officers who were involved in taser incidents. He also did not talk with any supervisors or watch commanders as part of that process. His review was a paper review only. (Nowacki Dep, pp. 31-33.)

**RESPONSE:**     Admit. Immaterial to Defendants' Motion for Summary Judgment.


28.     Deputy Chief Nowacki saw a printout of the taser download taken from OFC. SULLIVAN'S taser sometime before meeting with the other staff review team members. (Nowacki Dep, pp. 34-36; Taser Report, bates labeled D04278-D04279.)

**RESPONSE:**     Admit. Immaterial to Defendants' Motion for Summary Judgment.


29.     The staff review team concluded that the officers involved in taser usages in 2012 acted in accordance with ELK GROVE VILLAGE'S use of force policy. (Nowacki Dep, p. 49; Report dated January 8, 2013, bates labeled D01165-D01167). That included OFC. SULLIVAN'S use of a taser on September 30, 2012. (Nowacki Dep, p. 50.) The review team also found there was no reason to modify ELK GROVE VILLAGE'S present policy. (Report dated January 8, 2013, bates D01165.)

**RESPONSE:**     Admit. Immaterial to Defendants' Motion for Summary Judgment.

30.     After the staff review team submitted its report to Chief Schmidt, the Chief did not at any time overrule any of the conclusions that were stated in that report. In addition, he never issued any directives regarding making a change to the use of force policy or in connection with the training provided to officers with regard to use of force. (Nowacki Dep, p. 50.)

**RESPONSE:**     Admit. Immaterial to Defendants' Motion for Summary Judgment.

Respectfully submitted by,

/s/ Amanda M. Zdarsky
AMANDA M. ZDARSKY, Attorney #6303524
One of the Attorneys for ELK GROVE VILLAGE,
OFFICER JOHN WILLIAMS and OFFICER
RUSSELL SULLIVAN

KNIGHT, HOPPE, KURNIK & KNIGHT, LTD.
Attorneys for ELK GROVE VILLAGE,
OFFICERS JOHN WILLIAMS and RUSSELL SULLIVAN
5600 North River Road, Suite 600
Rosemont, Illinois 60018-5114
Telephone:     847/261-0700
Facsimile:     847/261-0714
E-Mail:     azdarsky@khkklaw.com

## CERTIFICATE OF SERVICE

The undersigned, one of the attorneys of record herein, hereby certifies that on January 9, 2017, the foregoing **RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS REQUIRING DENIAL BY ELK GROVE VILLAGE AND OFFICERS WILLIAMS AND SULLIVAN** was electronically filed with the Clerk of the U.S. District Court using the CM/ECF System, which will send notification of such filing to the following:

Martin A. Dolan, Mdolan@dolanlegal.com; kteele@dolanlegal.com

Karen Munoz, kmunoz@dolanlegal.com; mrose@dolanlegal.com

Gregory E. Rogus, grogus@grbarrister.com; efile@smsm.com; sdoman@smsm.com

William W. Kurnik, bkurnik@khkklaw.com; kstocco@khkklaw.com

Amanda M. Zdarsky, azdarsky@khkklaw.com; kstocco@khkklaw.com

/s/ Amanda M. Zdarsky
AMANDA M. ZDARSKY, Attorney #6303524

KNIGHT, HOPPE, KURNIK & KNIGHT, LTD.
Attorneys for ELK GROVE VILLAGE,
OFFICERS JOHN WILLIAMS and RUSSELL SULLIVAN
5600 North River Road, Suite 600
Rosemont, Illinois 60018-5114
Telephone:     847/261-0700
Facsimile:     847/261-0714
E-Mail:        azdarsky@khkklaw.com

G:\900 GallagherBass\6733 Rotter\pleadings\6733 Resp to PL Facts 17-01-09.docx